*Judge Hellerstein*

08 CV 4211

Wendy H. Schwartz (WS-1862)
Oliver Beiersdorf (OB-1421)
**REED SMITH LLP**
599 Lexington Avenue
New York, New York 10022
Tel. (212) 521-5400
Fax (212) 521-5450
Attorneys for Plaintiff
Glingrow Holding, Ltd.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



---

GLINGROW HOLDING, LTD.

      Plaintiff,

      v.

CAPITAMALL, LLC

      Defendant.

:
:
:
:
:
:
:
:
:
:
:

08 Civ.

---

## VERIFIED COMPLAINT

Plaintiff Glingrow Holding Ltd. (hereinafter "plaintiff" or "Glingrow"), by its

attorneys, Reed Smith LLP, as and for its complaint against defendant Capitamall, LLC

(hereinafter "defendant" or "Capitamall"), alleges as follows:

1.     This is an action for breach of a maritime contract and, as such, is an admiralty

and maritime claim within the meaning of 28 United States Code § 1333, and Rule 9(h) and

Supplemental Rule B of the Federal Rules of Civil Procedure. The matter also arises under the

Court's federal question jurisdiction within the meaning of 28 United States Code § 1331,

diversity jurisdiction pursuant to 28 U.S.C. § 1332, and/or the New York Convention on the

Recognition and Enforcement of Foreign Arbitral Awards (9 U.S.C. § 201 *et seq.*).

2.      Plaintiff was and still is a foreign corporation, or other business entity, duly organized, existing and operating under the laws of Cyprus, with a place of business at 15, Boumpoulinas, Povek Building, Apt. No. 301, Nicosia, Cyprus.

3.      Upon information and belief, defendant Capitamall was and still is a limited liability company with a registered address at 41 State Street, Suite 106, Albany, New York, 12207, duly organized and existing under the laws of the State of New York, which cannot be "found" within this district for the purpose of Rule B of the Supplemental rules of Civil Procedure for Certain Admiralty and Maritime Claims.

4.      On or about July 20, 2007, defendant, as disponent owner[1] of the Motor Vessel "STRANGE ATTRACTOR ("the Vessel"), and plaintiff, as charterer of the Vessel, entered into a maritime contract, namely a Charter Party agreement (hereinafter "Charter Party"), pursuant to which defendant agreed to charter the Vessel to plaintiff for a specified period.  A copy of the Charter Party between plaintiff and defendant is attached hereto as Exhibit "1".

5.      On or about September 27, 2007, defendant delivered the Vessel to plaintiff.

6.      Defendant thereafter caused the Vessel to become off-hire[2] on multiple occasions, including from:  September 28, 2007, 8:30 p.m. through September 30, 2007, 2:50 a.m.; October 1, 2007, 2:00 p.m. through October 30, 2007, 7:00 a.m.; November 13, 2007, 6:00 p.m. through November 17, 2007, 5:20 a.m.; and November 20, 2007, 12:44 p.m. through November 22, 2007, 9:10 p.m., for a total 35.71 days.

---

[1] A "disponent owner" controls the commercial operation of a vessel having taken the vessel on charter from the registered owner of the vessel.  The disponent owner initially time charters the vessel from the registered owner and the sub-charters the vessel to charterers.

[2] "Off-hire" refers to the period a vessel is unable to perform the services for which it is immediately required under a time charter.  A vessel goes off-hire at the moment when the ship's employment by the charterer under a time charter ceases.

7.      After the Vessel had begun a new voyage on December 11, 2007 under the direction of plaintiff, defendant again caused the Vessel to become off hire on December 15, 2007 at 12:20 p.m. Plaintiff was initially informed by defendant that the Vessel would be off-hire until on or around December 24, 2007. This date was subsequently extended by defendant several times. Consequently, plaintiff was deprived of its rightful use of the Vessel under the Charter Party.

8.      On January 18, 2008, plaintiff issued a Notice of Cancellation to defendant pursuant to Clause 57 of the Charter Party, because the defendant had caused the Vessel to become off-hire for more than 30 days. The Charter Party was thereby properly cancelled in accordance with Clause 57.

9.      A dispute has arisen between the parties regarding credits due to plaintiff from defendant, overpayments by plaintiff to defendant, and profits lost by plaintiff caused by defendant taking the Vessel Off-Hire as alleged herein, in breach of the Charter Party.

10.     As a result of the foregoing, the sum of $504,473.21 remains due and owning from defendant to plaintiff, resulting from, *inter alia,* overpayments of time charter fees by plaintiff resulting from the aforementioned off-hire periods, credits due to plaintiff for net fuel purchases and off-hire fuel consumption, and charges for passage through the Turkish Straits and the Suez Canal. Defendant has failed to forward payment of this amount despite due demand by plaintiff.

11.     As a further result of defendant's breach of the Charter Party, plaintiff has sustained additional damages in the form of lost profits in the amount of $1,536,410.00. Specifically, defendant's breach of the Charter Party resulted in the cancellation of sub-charter party entered into on December 14, 2007 between plaintiff and Olympic Carriers, Ltd. for three

3

consecutive voyages to transport wheat between Novorossiysk, Russia and Mediterranean ports in Egypt.

12.     In sum, as a result of defendant's breach of the Charter Party as aforesaid and otherwise under the terms of the Charter Party, plaintiff has sustained damages totaling $2,040,883.31 in direct losses and lost profits, exclusive of interest, arbitration costs and attorneys fees.  Defendant has failed to forward payment of this amount despite due demand by plaintiff.

13.     Pursuant to the Charter Party, disputes between the parties are to be submitted to arbitration in London subject to English law.  Plaintiff, though counsel, forwarded a Notice of Arbitration upon defendant on April 25, 2008.

14.     Plaintiff Glingrow has performed all of its obligations under the Charter Party.

15.     This action is brought in order to obtain jurisdiction over defendant and also to obtain security for plaintiff's claims and in aid of arbitration proceedings.

16.     Interest, costs and attorney's fees are routinely awarded to the prevailing party under English Law.  Section 63 of the English Arbitration Act of 1996 specifically allows for recovery of these items as part of an award in favor of the prevailing party.  As best as can now be estimated, plaintiff expects to recover the following amounts at arbitration as the prevailing party:

|  |  |  |
|---|---|---|
| A. | Principal claims: | $2,040,883.21 |
| B. | Estimated interest on claims – 3 years at 5.5% compounded quarterly: | 363,416.25 |
| C. | Estimated arbitration costs: | 75,000.00 |
| D. | Estimated attorneys' fees and expenses: | 175,000.00 |
|  | **TOTAL:** | **$2,654,299.46** |

17.     Defendant Capitamall cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Civil Procedure for Certain Admiralty and Maritime Claims, but upon information and belief, defendant Capitamall has, or will have during the pendency of this action, assets within this District and subject to the jurisdiction of this Court comprising of, *inter alia*, cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire , of, belonging to, due to or for the benefit of Capitamall (hereinafter "ASSETS"), including but not limited to ASSETS moving through banking institutions and/or other garnishees within the District, such as The Bank of New York, and/or Citibank N.A., and/or HSBC Bank USA, N.A., and/or JPMorganChase, and/or UBS AG, and/or Bank of America, N.A., and/or Standard Chartered Bank, and/or Northern Trust Corporation, and/or American Express Bank, and/or Credit Suisse First Boston,and/or Nordea Bank Denmark, and/or Belfolaise Bank, and/or Australia and New Zealand Banking Group Limited, and/or Nordea Bank Finland Plc, and/or Fortis Financial Services LLC, and/or Fortis (USA) Financial LLC, and/or ANZ (Delaware) Inc., and/or Calyon Corporate and Investment Bank, and/or Bank of China, and/or Deutsche Bank, and/or Danske Bank, and/or Barclays Bank, and/or Bangue Cantonale de Geneva, and/or BNP Paribas, and or Commerce Bank.

18.     Based upon the foregoing, the total sum of ASSETS of defendant Capitamall sought to be attached in this action is **$2,654,299.46**.

19.     Plaintiff seeks an Order from this Court directing the Clerk of the Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching, *inter alia*, any assets of the defendant

held by garnishees within the District for the purpose of obtaining personal jurisdiction over the

defendant and to secure the plaintiff's claims as described above.

WHEREFORE, plaintiff prays:

A.    That the Court issue process in due form of law according to the practice of this

Court in admiralty and maritime jurisdiction issue against Defendant, citing it to appear and

answer under oath all and singular matters alleged in this Complaint, failing which default

judgment be entered against it;

B.    That because defendant cannot be found within this District pursuant to Rule B of

the Supplemental Rules of Civil Procedure, this Court issue an order directing the Clerk of Court

to issue Process of Maritime Attachment and Garnishment, pursuant to Rule B of the

Supplemental Rules of Civil Procedure, attaching all goods, chattels, assets, credits, bills of

lading, claims, assets, cash, funds credits, wire transfers, electronic funds transfers, accounts,

letters of credit, freights, sub-freights, charter hire and/or sub-charter hire , tangible or intangible,

of, belonging to, due to, claimed by, being held for or on behalf of, or being transferred for the

benefit of Defendant, including such assets as may be in the possession, custody or control of, or

being transferred through any garnishee within this District, including, without limitation, assets

held by or at The Bank of New York, and/or Citibank N.A., and/or HSBC Bank USA, N.A.,

and/or JPMorganChase, and/or UBS AG, and/or Bank of America, N.A., and/or Standard

Chartered Bank, and/or Northern Trust Corporation, and/or American Express Bank, and/or

Credit Suisse First Boston, and/or Nordea Bank Denmark, and/or Belfolaise Bank, and/or

Australia and New Zealand Banking Group Limited, and/or Nordea Bank Finland Plc, and/or

Fortis Financial Services LLC, and/or Fortis (USA) Financial LLC, and/or ANZ (Delaware) Inc.,

and/or Calyon Corporate and Investment Bank, and/or Bank of China, and/or Deutsche Bank,

and/or Danske Bank, and/or Barclays Bank, and/or Bangue Cantonale de Geneva, and/or BNP

Paribas, and or Commerce Bank up to and including the amount of $2,654,299.46 to secure

Plaintiff's claims including interest and costs, and that all persons claiming any interest in the

same be cited to appear and answer the matters alleged in the Complaint;

      C.    That Plaintiff may have judgment for its claims as aforesaid in the amount of

$2,654,299.46

      D.    That in the event the Writ of Attachment issued herein restrains the property of

defendant found within this District and

            i)    notice has been properly served upon the Defendant in the manner

                required by Rule B(2) of the F.R.C.P. Supplemental Rules for Admiralty

                and Maritime Claims and Rule B(2) of the Local Rules of the United

                States District Courts for the Southern and Eastern Districts of New York;

                and

            ii)    the Defendant fails to appear before the Court; and

            iii)    upon application by plaintiff,

a default judgment be granted to plaintiff in the amount of provable damages limited to the

extent of property subjected to the process of maritime attachment;

      E.    That the Court retain jurisdiction to compel the Defendant to arbitrate in

accordance with the United States Arbitration Act, 9 U.S.C. § 1 *et seq.* and otherwise under

applicable law;

      F.    That the Court retain jurisdiction over this matter through the entry of any

judgment or award associated with any of the claims currently pending or which may be initiated

in the future, including any appeals thereof;

G.    That the Court recognize and confirm any arbitration award(s) or judgment(s)

rendered on the claims set forth herein as a Judgment of this Court;

E.    That plaintiff be awarded attorneys fees and cost associated with this action; and

F.    That plaintiff be awarded such other, further and different relief as the Court

deems just and proper.


Dated:  New York, New York
       May 2, 2008

                       REED SMITH LLP

                       By: _____
                           Wendy H. Schwartz (WS-1862)
                           Oliver Beiersdorf (OB-1421)
                       599 Lexington Avenue
                       New York, NY  10022-7650
                       Telephone:  212.521.5400
                       Facsimile:  212.521.5450

                       *Attorneys for Plaintiff*
                       *Glingrow Holding Ltd.*

# Exhibit 1

ORIGINAL

# TIME CHARTER

GOVERNMENT FORM

Approved by the New York Produce Exchange

November 6th, 1913-Amended October 20th, 1921; August 6th, 1931; October 3rd, 1946

1.  **This Charter Party**, made and concluded in *Novorossiysk* .......................................... **20th** day of *July 2007*
2.  Between ... Messrs ... *CAPITAMALL LLC, ALBANY, USA.* ..................................................................
3.  *Disponent* Owners of the good ...Steamship/Motorship... *"STRANGE ATTRACTOR 1"(See description Clause 77)* .......................
4.  of ..............tons gross register, and ............tons net register, having engines of .........................................indicated horse power
5.  and with hull, machinery and equipment in a thoroughly efficient state, and classed .....................................................tons of 2240 lbs
6.  at .................................................................of about ............cubic feet bale capacity, and about ......................................tons of 2240 lbs
7.  deadweight capacity (cargo and bunkers, constants excluding including fresh water and store not exceeding one and one half percent of ships
8.  deadweight capacity,
9.  allowing a minimum of fifty tons) on a draft of ...................feet ...............inches on ....................................Summer freeboard inclusive of permanent bunkers
10. which are of the capacity of about ..................................................................tons of fuel, and capable of steaming, fully laden, under good weather
11. conditions about .............................knots on a consumption of about ............................................of best Welsh coal best grade fuel oil best grade Diesel oil.
12. now ......*trading* ..............................................................................Charterers of the City of ...*NICOSIA.* ...........................

...............................and ... Messrs *GLINGROW HOLDING LTD.* .................................................................

13. **Witnesseth**, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the time of delivery, for
14. *about 3 - 4 months at Charterers option via safe port(s)/safe berth(s) / safe anchorage(s)*
15. *within below mentioned trading limits.*
16. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers remaining responsible for
17. the fulfilment of this Charter Party. *Acceptance of delivery by Charterers shall not constitute any waiver of Owners' obligations hereunder.*
   *Acceptance of redelivery by Owners shall not constitute any waiver of Charterers obligations under the Charter Party.*
18. Vessel to be placed at the disposal of the Charterers, at *on dropping last outward sea pilot Salerno at any time, day or night, Sundays and*
19. *Holidays included.*
20. in such dock or at such wharf or place ( where she may safely lie, always afloat, at all times of tide, except as otherwise provided in clause No.6) as
21. the Charterers may direct. If such dock, wharf or place be not available time to count as provided for in clause No.6. Vessel on her arrival at first and
   *subsequent loadport(s) delivery to be*
22. ready to receive *any permissible cargo to Charterers' / Surveyors' satisfaction. Should the vessel fail to pass such survey then vessel to be put*
   *off-hire from time of failure until vessel is fully accepted (See Clause 50). On delivery and throughout the Charter vessel to be*
   *with clean swept holds and* tight, staunch, strong and every way fitted for the service, having water ballast, cranes winches and
23. donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other power sufficient to run all the *cranes winches at one (and*
   *the same*
24. time (and with full complement of officers, seamen, engineers and firemen for a vessel of her tonnage), to be employed, in carrying lawful merchan-
25. dise, including petroleum or its products, in proper containers, excluding *See Clause 30.*
26. (vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a small number on deck at their risk,
27. all necessary fittings and other requirements to be for account of Charterers), in such lawful trades, between safe port and/or ports *AND/OR SAFE*

ORIGINAL

PLACES in British North

28. America and/or United States of America, and/or West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or
29. Mexico, and/or South America and/or Europe
30. and/or Africa, and/or Asia, and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, River St. Lawrence between
31. October 31st and May 15th, Hudson Bay and all unsafe ports, also excluding when out of season, White Sea, Black Sea and the Baltic
32. *Trading exclusions, see Clause 31*
33. ............................................................................................................................................................................................................................
34. ............................................................................................................................................................................................................................
35. as the Charterers or their Agents shall direct, on the following conditions:
36. 1. That the Owners shall provide and pay for all provisions, wages and consular shipping and discharging fees of the Crew shall pay for the
37. insurance of the vessel, also for all the cabin, deck, engine-room and other necessary stores, including boiler water and maintain her class and keep
38. the vessel in a thoroughly efficient state in hull, *cargo spaces*, machinery and equipment *with all certificates necessary to comply with current*
39. *requirements at ports of call* for and during the service.
40. 2. That, *whilst on hire*, the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port Charges, *compulsory including transit to*
41. *Black Sea North/South pilotage Bosporus*, Pilotages, Agencies, *(except agency fee directly related to Owners' matters)*, Commissions,
42. Consular Charges (except those pertaining to the Crew), and all other usual expenses except those before stated, but when the vessel
43. puts into a port for causes for which vessel *and/or her Owners are* is responsible, then all such charges incurred shall be paid by the Owners.
44. Fumigations ordered because of
45. illness of the crew or *cargoes carried prior to delivery* to be for Owners account. Fumigations ordered because of cargoes carried or ports visited while
46. vessel is employed under this
47. charter to be for Charterers account. All other fumigations to be for charterers account after vessel has been on charter for a continuous period
48. six months or more.
49. Charterers are to provide necessary dunnage and shifting boards, also any extra fittings requisite for a special trade or unusual cargo, but
50. Owners to allow them the use of any dunnage and shifting boards *and any other fittings* already aboard vessel. Charterers to have the privilege of using
51. shifting boards
52. for dunnage, they making good any damage thereto.
53. 3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and pay for all fuel remaining on
54. board the vessel at the current prices in the respective ports, the vessel to be delivered with not less than ................ tons and not more than
55. ................ tons and to be re-delivered with not less than ................ tons and not more than ................ tons. *See Clause 44*.
56. 4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of *(see Clause 34)*.
57. ............................................................................... United States Currency per ton on vessel's total deadweight carrying capacity, including bunkers and
58. stores, on ............................................ summer freeboard, per Calendar Month, commencing on and from the day of her delivery, as aforesaid, and at
59. and after the same rate for any part of a *day* month; hire to continue until the hour of the day of her re-delivery in like good order and condition, ordinary
60. wear and tear excepted, to the Owners (unless lost) at *on dropping last outward sea pilot one safe port Red Sea, Aqaba - Aden range or one safe port*
61. *Mediterranean Sea at Charterers option at any time, day or night, Sundays and Holidays included*
62. unless otherwise mutually agreed. Charterers are to give Owners not less than ....... 15 ....... days
63. notice of vessels expected date of re-delivery, and probable port.
64. 5. Payment of said hire to be made *direct to Owner's nominated bank account* in New York in cash in United States Currency, *semi-monthly every 15*
65. *days* in advance *(See Clause 34)*, and for the last *15 days half month* or
66. part of same the approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day, as it becomes
67. due, if so required by Owners, unless bank guarantee or deposit is made by Charterers, otherwise failing the punctual and regular payment of the
68. hire, or bank guarantee, *or deposit*, or on any *fundamental* breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the

ORIGINAL

service of the Charterers,

62  without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~Time to count from 7 a.m. on the working day~
63  ~following that on which written notice of readiness has been given to Charterers or their Agents before 4 p.m., but if required by Charterers, they~
64  ~to have the privilege of using vessel at once, such time used to count as hire.~ *See Clause 64.*
65  Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, by the Charterers or their Agents, subject
66  to 2 1/2% commission and such advances shall be deducted from the hire. The Charterers, however, shall in no way be responsible for the application
67  of such advances.
68  6. That the cargo or cargoes be laden and/or discharged in any dock or at any wharf or place *or anchorage in port or elsewhere that Charterers or their*
   *Agents may*

69  direct, provided the vessel can safely lie always afloat at any time of tide, except at such places where it is customary for similar size vessels to safely
70  lie aground.
71  7. That the whole reach of the Vessel's Hold, Decks and usual places of loading (not more than she can reasonably stow and carry), also
72  accommodations for Supercargo, if carried, shall be at Charterers disposal, reserving only proper and sufficient space for Ship's officers, crew,
73  tackle, apparel, furniture, provisions, stores and fuel. ~Charterers have the privilege of passengers as far as accommodation allow. Charterers~
74  paying Owners ............... ~per day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~
75  ~incurred in the consequence of the carriage of passengers, Charterers are to bear such risk and expense. No passengers allowed.~
76  8. That the Captain shall prosecute his voyage with the utmost despatch, and shall render all customary assistance with ship's crew and
77  boats. The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards employment and
78  agency; and Charterers are to load, stow, and trim, the cargo at their expense under the supervision of the Captain, who is to sign *or when required by*
   *Charterers, authorize the Charterers or their agents to sign* Bills of Lading *on his behalf* for

79  cargo as presented, in conformity with Mate's or Tally Clerk's receipts.
80  9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or Engineers, the Owners shall on
81  receiving particulars of the complaint, investigate the same, and, if necessary, make a change in the appointments.
82  10. That the Charterers shall have the permission to appoint a Supercargo, who shall accompany the vessel and see that voyage is prosecuted
83  with the utmost despatch. He is to be furnished with free accommodation, and same fare as provided for Captain's table, Charterers paying at the
84  rate of *US$10.00* per day, Owners to victual Pilots and Customs Officers, and also, when authorized by Charterers or their agents, to victual Tally
85  Clerks, Stevedore's Foreman, etc., Charterers paying *Owners US$ 1500.00 per 30 days* ~at the current rate per meal,~ *for Charterers* ~all such~ *victualling,*
   *communication and entertainment.*

86  11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing directions, in writing, and the
87  Captain shall keep a full and correct Log of the voyage or voyages, which are to be patent to the Charterers or their Agents, and furnish the Char-
88  terers, their Agents or Supercargo, when required, with a true copy of daily *deck and engine* Logs, showing the course of the vessel and distance run and
   the con-

89  sumption of fuel, *as well as revolutions of main engine and velocity of and direction of wind and sea, all in English language.*
90  12. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural ventilation.*
91  13. ~That the Charterers shall have the option of continuing this charter for a further period of~
92  ..................................................................... ~days previous to the expiration of the first named term, or any declared option~
93  ~on giving written notice thereof to the Owners or their Agents.~
94  14. That if required by Charterers, time not to commence before ........... *00:01HRS Local Time 27th July 2007* ...................... *and should vessel*
95  not have *delivered* ~given written notice of readiness on or before~ ......... *23:59HRS Local Time 16th September 2007* ... *but not later than 4 p.m.* Charterers or
96  their Agents to have the option of cancelling this Charter at any time not later than the day of vessel's readiness.
97  15. That in the event of the loss of time from deficiency *and/or default and/or strike* of men or *deficiency of* stores, fire, breakdown or damages to hull,
   machinery or equipment,

ORIGINAL

98. grounding, detection by average accidents to ship or cargo, drydocking for the purpose of examination or painting bottom, or by any other cause
99. preventing the full working of the vessel, the payment of hire shall cease for the time thereby lost, and *all extra expenses may be deducted from the hire,*
100. and if upon the voyage the speed be reduced by
101. defect in or breakdown of any part of her hull, machinery or equipment, the time so lost, and the cost of any extra fuel consumed in consequence
102. thereof, and all extra expenses shall be deducted from the hire.
103. 16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or being last heard of) shall be
104. returned to the Charterers at once. The act of God, enemies, fire, restraint of Princes, Rulers and People, and all dangers and accidents of the Seas,
105. Rivers, Machinery, Boilers and Steam Navigation, and errors of Navigation throughout this Charter Party, always mutually excepted.
106. The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in distress, and to deviate for the
107. purpose of saving life and property.
108. 17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to three persons at *London New York,*
109. one to be appointed by each of the parties hereto, and the third by the two so chosen, their decision or that of any two of them, shall be final, and for
110. the purpose of enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercialmen. *See further Arbitration*
111. *Clause 39.*
112. 18. That the Owners shall have a lien upon all cargoes, and all sub-freights for any amounts due under this Charter, including General Aver-
113. age contributions, and the Charterers to have a lien on the Ship for all monies paid in advance and not earned, and any overpaid hire or excess
114. deposit to be returned at once. Charterers will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which
115. might have priority over the title and interest of the owners in the vessel.
116. 19. That all derelicts and salvage shall be for Owners' account and Charterers' equal benefit after deducting Owners' and Charterers' expenses and
117. Crew's proportion. General Average shall be adjusted, stated and settled, according to Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rule F of
118. York-Antewerp Rules 1924, *1990 and subsequent revisions at London, unless Charterers' sub-charter parties provide otherwise, in which event*
119. *Owners shall submit to Charterers, sub-charterers' Jurisdiction Clause when requested by Charterers, at such port or place in the United States as*
120. *may be selected by Owners and Charterers by mutual agreement. Owners respecting subcontract stipulation as long as confirmed to London or New*
121. *York or other recognized place of adjustment. the carrier and as to matters not provided for by these*
122. Rules, according to the law and usages at the port of New York. In such adjustment disbursements in foreign currencies shall be exchanged into
123. United States money at the rate prevailing on the dates made and allowance for damage to cargo claimed in foreign currency shall be converted at
124. the rate prevailing on the last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement or
125. bond and such additional security, as may be required by the carrier, must be furnished before delivery of the goods. Such cash deposit as the carrier
126. or his agents may deem sufficient as additional security for the contribution of the goods and for any salvage and special charges thereon, shall, if
127. required, be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the
128. carrier, be payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in the special account at the
129. place of adjustment in the name of the adjuster pending settlement of the General Average and refunds or credit balances, if any, shall be paid in
130. United States money. *Charter hire not to contribute to General Average.*
131. In the event of accident, danger, damage, or disaster, before or after commencement of the voyage, resulting from any cause whatsoever,
132. whether due to negligence or not, for which, or for the consequence of which, the carrier is not responsible, by statute, contract, or otherwise, the
133. goods, the shipper and the consignee, jointly and severally, shall contribute with the carrier in general average to the payment of any sacrifices,
134. losses, or expenses of a general average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the
135. goods. If a sailing ship is owned or operated by the carrier, salvage shall be paid for as a fully and in the same manner as if such sailing ship or
136. ships belonged to strangers.
137. Provisions as to General Average in accordance with the above are to be included in all bills of lading issued hereunder
138. 20. Fuel used by the vessel while off hire, also for cooking, condensing water, or for grates and stoves to be agreed to as to quantity, and the
139. cost of replacing same, to be allowed by Owners.
140. 21. That as the vessel may be from time to time employed in tropical waters during the term of this Charter, Vessel is to be docked at a

ORIGINAL



136. convenient place, bottom cleaned and painted whenever Charterers and the Captain think necessary, at least once in every six months, reckoning from
137. time of last painting, and payment of the hire to be suspended until she is again in proper state for the service.
138. *Should bottom cleaning become necessary at any time during this charter as part of the vessel's maintenance than that the vessel shall be off-*
139. *hire for any time thereby lost. No drydocking except in case of emergency.*
140. 22. Owners shall maintain the gear of the ship as fitted, providing gear (for all cranes derricks) capable of handling lifts up to their *maximum capacity in*
     *accordance with the Description Clause* three ................................ tons, also

141. providing ropes, falls, slings and blocks. If vessel is fitted with derricks capable of handling heavier lifts, Owners are to provide necessary gear for
142. same, otherwise equipment and gear for heavier lifts shall be for Charterers' account. Owners also to provide on the vessel *power and electric light on deck*
     *and in cargo holds sufficient for night work in all holds simultaneously lanterns and oil for*

143. night work, and vessel to give use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense. The
144. Charterers to have the use of any gear on board the vessel.
145. 23. Vessel to work night and day, if required by Charterers, and all cranes winches to be at Charterers' disposal during loading and discharging;
146. steamer to provide one winchman per hatch to work winches day and night, as required. Charterers agreeing to pay officers, engineers, winchmen,
147. deck hands and boatsmen for overtime work done in accordance with the working hours and rates stated in the ship's articles. If the rules of the
148. port, or labor unions, prevent crew from diving winches, there Winchmen to be paid by Charterers. In the event of a disabled winch or winches, or
149. insufficient power to operate winches, Owners to pay for share engine, or engines, in lieu thereof, if required, and pay any loss of time occasioned
150. thereby. *Any time lost due to crane breakdown and/or insufficient power to be deducted pro rata to the number of gangs affected, provided it is*
     *always understood that the deduction, if any, from hire is sufficient and appropriate the Charterers for proven actual loss suffered.*

151. 24. It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions from liability contained
152. in the Act of Congress of the United States approved on the 13th day of February, 1893, and entitled "An Act relating to Navigation of Vessels;
153. etc.," in respect of all cargo shipped under this Charter to or from the United States of America. It is further subject to — the following clauses, both
154. of which are to be included in all bills of lading issued hereunder:

155.                                    U.S.A. Clause Paramount
156. — This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United States, approved April
157. 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained shall be deemed a surrender by the carrier of
158. any of its rights or immunities or an increase of any of its responsibilities or liabilities under the said Act. If any term of this bill of lading
159. be repugnant to said Act to any extent, such term shall be void to that extent, but no further.

160.                                    Both to Blame Collision Clause
161. If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the
162. Master, mariner, pilot or the servants of the Carrier in the navigation of in the management of the ship, the owners of the goods carried
163. hereunder will indemnify the Carrier against all loss or liability to the other or non carrying ship or her owners in so far as such loss
164. or liability represents loss of, or damage to, or any claim whatsoever of the owner of said goods, paid or payable by the other or non
165. carrying ship or her owner to the owners of said goods and set off, recouped or recovered by the other or non carrying ship or her
166. owners as part of their claim against the carrying ship or carrier.

167. 25. The vessel shall not be required to enter any ice-bound port or any port where there lights or light ships have been or are about to be with-
168. drawn by reason of ice, or where there is risk that in ordinary course of things the vessel will not be able on account of ice to safely enter the
169. port or to get out after having completed loading or discharging.

170. 26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to remain responsible for the
171. navigation of the vessel, acts of pilots and tugboats, insurance, crew, and all other matters, same as when trading for their own account.
172. 27. A commission of 2 ½ per cent is payable by the vessel and Owners to
173. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
174.

ORIGINAL

175    28. An address commission of 2 ½ per cent is payable to ...... *Charterers*    ............. on the hire earned and paid under this Charter.

*Additional Clauses 29 to 80 (both inclusive) as attached are to be fully incorporated in this Charter Party.*

THE OWNERS



THE CHARTERERS

This Charter Party is a computer generated copy of the NYPE(Reversed 3rd October, 1946) from printed under licence from the Association Ship Brokers & Agents (U.S.A.), Inc., using software which is the copyright of Strategic Software Limited.

It is a precise copy of the original document which can be modified, amended or added to only by the striking out of original characters, or the insertion of new characters, such characters being clearly highlighted by underlining or use of colour or use of a larger font and marked as having been made by the licensee or end user as appropriate and not by the author.

ORIGINAL

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED 20th JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW

### Clause 29:
Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates, approvals, equipment and fittings, enabling the vessel and her crew to load, carry, discharge all cargoes permitted under this Charter Party and bunker within the trading limits of this Charter Party, even where such certificates become necessary before or after the commencement of this Charter Party.

### Clause 30: Cargo exclusions.
VESSEL TO TRADE ALWAYS WITH LAWFULL / HARMLESS / NON DANGEROUS / NON CORROSIVE /NON INFLAMMABLE / NON INJURIOS / NON HAZARDOUS / CARGOES EXCLUDING ANY CARGO UNDER 'IMDG IMO CODE' AND ALWAYS IN CONFORMITY WITH VESSEL'S CERTIFICATE OF COMPLIANCE FOR THE CARRIAGE OF SOLID BULK CARGOES AND SPECIFICALLY NONE OF THE FOLLOWING CARGOES LISTED BELOW ARE TO BE LOADED DURING THE CURRENCY OF THIS CHARTER:

CALCIUM CARBIDE, CALCIUM HYDROCHLORIDE, CALCIUM HYPOCHLORIDE, WHEAT-FLOUR, RESINS, BOMBS, BONES, MOTOR VEHICLES, PREFABRICATED HOUSES + MOBILE BUILDINGS, CAMPINGS CARAVANS + TRAILERS, RAILWAY WAGONS, FERRO CILICON INCLUDING SILICON MANGANESE, ORGANIC PEROXIDES, CREOSOTED GOODS, SULPHUR, ALUMINA, SALT, NAPHTHA, TAR, PITCH, ASPHALT AND THEIR PRODUCTS IN BULK, ARMS, AMMUNITION, EXPLOSIVES INCLUDING BLASTING AND DETONATOR CAPS, NUCLEAR PRODUCTS, NUCLEAR FUELS OR RADIO ACTIVE MATERIAL OR WASTE, RADIOACTIVE PRODUCTS AND WASTE, MOTOR BLOCKS SHAVINGS AND TURNINGS, SCRAP OF ANY KIND, PETROLIUM OR ITS PRODUCTS INCLUDING MOTOR SPIRIT, POND COAL, DENVO COAL, PETROLIUM COKE, HIDES, WET HIDES, COPRA AND/OR ITS PRODUCTS, BAGGED AND/OR BULK FISHMEAL, NIGER SEED AND SUNFLOWER SEED EXPELLERS, MANIOC AND/OR MANIOC PELLETS, BLACK POWDER, TURPENTINE, BAUXITE, LOGS OF ANY KIND, MAHOGANY LOGS, LIVESTOCK, ACIDS, INFLAMMABLE, INJURIOUS, CORROSIVE AND DANGEROUS GOODS AS DEFINED BY IMO, CHARCOAL, CEMENT AND CEMENT CLINKER IN BULK, DRI PELLETS, DIRECTLY REDUCED IRON /IRON ORE, BRIQUETTES, HBI, AMMONIUM NITRATE, NITRATE OF AMMONIA, BULK AMMONIUM SULPHATE, POTASSIUM CHLORIDE, CONCENTRATES, BORAX, QUEBRACO EXTRACT, SODA ASH.

ANY CARGOES CARRIED TO BE LOADED IN ACCORDANCE WITH IMO REGULATIONS AND REQUIREMENTS, NOT WITHSTANDING ANY OTHER PROVISIONS.

### Clause 31: Trading Exclusions.
Time charter trading world wide via safe anchorage(s), safe berth(s), safe port(s) always accessible, always within Ins. Warranty Limits excluding:

Albania, Eritrea, Russian Pacific ports, Cambodia, Ethiopia, Somalia,Israel, Turkish occupied Cyprus, Haiti Islands, Namibia, North Korea, Iraq, Liberia, Ghana, Nigeria, Australia/ N. Zeeland and their territories, Lakes trading only between May-October, USA, Scandinavia including Finland but DENMARK to be allowed, Angola, Nicaragua, Sierra Leone, Guinea Bissau, Orinoco River, Lebanon, Zaire, Libya (including Gulf of Sidra/ Sirte), Sea of Azov, and to places / countries against which U.N. sanctions apply / may apply from time to time.

Trading to Algeria always sub owners prior approval.

Vessel not to be sub-chartered to companies based in countries where trading exclusions are imposed. Vessel not to be sub-chartered to Calder Seacarierrs, Universal Cargo Lines or any company in anyway connected with these two companies.

Vessel not to be traded in areas or ports having war or warlike conditions prevail 'Conwartime' Clause shall apply.

No direct trade between People's Republic of China / Taiwan.

Any extra war risks to be for Charterers' account in line with London Market.

World-wide trading within Institute Warranty Limits, Charterers' option break IWL for Lakes trading only, Charterers Paying relevant extra insurance as per net premium paid by Owners which does not exceed London minimum scale.

No trading in ice, vessel not to force ice nor follow ice-breaker. Charterers' option NAABSA in Argentina, Uruguay And Buenaventura.

Basic War Risk Insurance Premium for worldwide trading to be Owners' account. Any additional War Risk Insurance Premium for trading areas excluded from basic War Risk Insurance, also premium for blocking/ trapping Insurance, crew war bonus and loss of hire to be for Charterers' account.

Charterers have the option to call Yemen for discharging grain products within the specifications in the Charter Party cargo exclusions under following conditions:

Charterers are to remain fully responsible and settle directly all cargo shortage claims of whatsoever nature including possible delays. Extra insurance premium, if any, for calling Yemen is to be for Charterers account and to be settled by Charterers against Owners Insurance company respective invoice (fax/e-mail copy is acceptable).

-1-

ORIGINAL

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED 20th JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW

### Clause 32: Crew Service.
With reference to Clause 8 of this Charter Party "customary assistance" shall include, but not be limited to:
a) All opening and closing of hatches, when and where required, if permitted by local regulations.
b) Raising and lowering of derricks and rigging cranes, if fitted and/or gangways in preparation for loading and discharging.
c) Deleted.
d) Shaping up vessel's holds/hatches and cranes prior arrival at loading and/or discharging places so as to immediately commence loading and/or discharging operations subject to weather conditions and the safety of the crew.
e) Deleted.
The above services shall be considered as a minimum and shall in no way be construed as an alternative to or reduction in the standard of services from Officers and crew required under this Charter Party.

### Clause 33: Grab Fitting/Operation.
Charterers have the free use of vessel's cranes and Charterers are specifically allowed to mount grabs to cranes provided total load not exceeding cranes' SWL.

### Clause 34: Payment conditions.
Hire rate: USD 21'000 (say: twenty one thousand, 00) per day pro rata including overtime less address commission 2,5% to be paid to Owners nominated bank account every 15 (fifteen) days in advance.
1st advance payment in amount USD 200'000 to be arranged upon receipt of 10 days initial notice of delivery within 2 (two) banking days.
2nd payment for 1st 15 days together with value of bunkers on delivery but less amount of 1st payment payable within 3 (three) banking days after vessel's delivery.
Charterers have right to educt value of bunkers on redelivery from last sufficient hire payment(s).
Owners bank account for hire payments:

Beneficiary bank: Alpha Bank Limited,
              Nicosia International Banking Services Unit
          ·    1,Agapinoros Street,1st Floor
              P.O.Box21661,1596 Nicosia,Cyprus
Beneficiary bank SWIFT code: ABKLCY2N
Correspondent bank: American Express Bank Ltd, New York
              SWIFT: AEIBUS33
              Account no.: 000736025
Beneficiary name: Capitamall LLC
Beneficiary IBAN no.     CY18 0090 0202 0002 0210 60186913

### Clause 35: Holds cleaning.
Intermediary hold cleaning is USD 3500.00 lumpsum payable together with hire.
Charterers shall have the option of redelivering the vessel without cleaning of holds against paying the Owners a lumpsum USD 4500.00 - in lieu of hold cleaning, excluding possible dunnage, debris, lashing, which is to be paid together with last sufficient hire payment.

### Clause 36:
Charterers have the option to carry one original Bill of Lading in ship's bag in which case all these originals shall be marked "One original Bill of Lading retained on board vessel against which Bill of Lading delivery of cargo may properly be made on instructions received from Charterers."

### Clause 37: - Deleted.

### Clause 38:  - Deleted.

### Clause 39: Arbitration Clause.
This Charter Party shall be governed by English Law.

It is hereby agreed that all claims below USD 50 000.00 excluding interest and costs, shall be settled as per current LMAA Small Claims Procedure.

-2-

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED 20th JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW

### Clause 40: Arrest.

Should the vessel be arrested during the currency of this Charter at the suit of any person including Charterers having or purporting to have a claim against or any interest in the vessel, hire under this Charter party shall not be payable in respect of any period whilst the vessel remains unemployed as a result of such arrest, and the Owners shall reimburse to the Charterers any proven directly related expenses which they may incur in respect of such arrest, provided not already covered by non-payment of charter hire.

This Clause shall not apply should the arrest be caused through any fault on the part of Charterers.

### Clause 41: Deleted.

### Clause 42: Bills of Lading.

Charterers' Bills of Lading to be used if required by Charterers.

a) Discharging port(s) shown on Bills of Lading do not constitute a declaration of discharging port(s) and Charterers to have the right to order the vessel to any port(s) within terms of this Charter-Party. In this case Charterers to give prior notice thereof well in advance to Owners. Charterers hereby indemnify Owners against any claim and any additional expenses brought by holders of Bills of Lading by reason of a change of destination, however, Charterers are always to provide a Letter of Indemnity as per Owners' P. and 1. Club, signed by Charterers and Receivers only be provided with a bank guarantee failing which Owners will not authorize discharging of relevant cargo.
Shipowners will cooperate to Charterers in all possible ways if change of discharging port is required.

b) In case original B/LS are not available at the discharging ports upon vessels arrival, Charterers and owners agreed following two variants of procedure to discharge the cargo without presentation of original B/L:

1. Receiver's bank gives their standard guarantee letter stating the name of the party to whom cargo to be released. Owners instruct master to deliver cargo to receivers without presentation of original Bs/L upon receipt fax copy of such bank's letter of guarantee.
2. In case, Charterers fail to arrange procedure as per above item (1) following procedure to apply:
Owners instruct master to deliver cargo to receivers without presentation of original Bs/L upon receipt by fax copy of LOI from Charterers as per Owners P and I wording duly signed by Shippers, Receivers, Charterers and copy of the Bs/L duly endorsed by receivers bank, showing clearly receivers names.

c) If required, master to authorize Charterers agents in writing to sign Bill(s) of Lading on his behalf strictly in conformity with Mate(s) and Tally Clerk(s) receipts. Bill(s) of Lading to contain Hague or Hague / Visby rules. No liner or through Bill(s) of Lading to be issued. Master's authorization not to apply for deck cargo. Neither the Charterers nor their agents shall permit the issue of any Bill/s of Lading , waybills or other document evidencing a contract of carriage(whether or not signed on behalf of any sub Charterers), incorporating, where not compulsorily applicable, the Hamburg rules or any other legislation giving effect to the Hamburg rules or any other legislation imposing liabilities in excess of Hague or Hague Visby rules. The Charterers shall indemnify the Owners against any liability, loss or damage which may occur only as a result of Charterers orders and contrary to Owners instructions.

d) No liner/transshipment/throughway B/LS to be used under this C/P.

e) Charterers to have the option to split to smaller quantities the original issued Bs/L (the draft of new BS/L to be approved by Owners), provided that the full set of the original BS/L will be surrendered to the Owners or their appointed agent prior of issuing the new BS/L. Total quantity always to remain the same and Master/Owners to be responsible only for the total quantity as shown on the first original set.
Charterers will always have the option to insert different names of shippers/receivers/consignees on the new BS/L or use other language, however a copy with full translation to be provided by Charterers.
Charterers also to have the option to issue the 1st or the 2nd set with less or more freight rate than the actual agreed and Charterers keep Owners harmless/non responsible for any consequences arising there from.
All/any changes in BS/L to be made only against Charterer's LOI issued as per Owner's P & I wording and signed by Charterers only.

f) Charterers to issue other set of BS/L however same will be carried only after Owners' approval of draft new set and same will be released only after surrender of previous set.

g) Charterers' option vessel to have Mate's receipts issued only at loading port in which case Bills of Lading to be issued either by load port agents on Masters' behalf or in Charterers' office and signed by Owners' representative, always accordance with Mate's receipts.

-3-

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED 20th JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW

When and if required Charterers may place one Original Bill of Lading on board, against which Bill of Lading delivery of cargo to take place on instructions received from Shippers/Charterers, and all Original Bills of Lading to be marked accordingly.

Cargo will be delivered only against duel processed Bill(s)/Lading.

### Clause 43: Bulldozers.
Charterers to have the option to use bulldozers in vessel's holds, provided not exceeding the tank top strength. If required, vessel to lift onboard, shift from hold to hold and discharge the bulldozers by use of vessel's gear.

### Clause 44: Bunkers.
Bunkers on delivery to be paid together with first hire payment as per agreed prices, estimated bunker on redelivery to be deducted from last sufficient hire payment. Vessel to be delivered with about 220 mts IFO plus about 30 mts MGO and vessel to be redelivered with about same quantity of bunkers.
Prices on delivery/redelivery to be the same:  IFO - 365 USD per ton  / MGO - 660 USD per ton.
Owners have the right to bunker the vessel for their own account during the currency of this charter party subject receipt of Charterers approval for same in advance.

### Clause 45: Cargo Claims.
The Charterers shall not be liable for loss of life nor personal injury nor arrest or seizure, loss or damage to the vessel, her cargo and/or other objects arising from perils insured against by customary policies of insurance.

### Clause 46: Certificates/Vaccinations.
Owners are obliged to deliver and maintain throughout the currency of this Charter Party the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates (including Oil Pollution Certificates), approvals, equipment and fittings, enabling the vessel and her crew to trade within the trading limits and to load, carry and discharge all cargoes permitted under this Charter Party.
Officers and crew to comply with vaccination and sanitary regulations in all ports of call and corresponding certificates to be available onboard, enabling the vessel to obtain free pratique by radio.
If requested, Owners to provide Charterers with copies of any and all such certificates/approvals.
Any time lost and all extra directly related expenses resulting from Owners' non-compliance with the above to be for Owners' account and same may be deducted from hire.

### Clause 47:
Charterers may deduct from the charter hire any amount disbursed for Owners' account, provided agreed with Owners in advance for any items in excess of USD 500.00.
In addition Charterers may deduct from last hire payment(s) the reasonable estimated expenses incurred by Charterers for Owners' account notwithstanding that vouchers may not then have reached Charterers for submission to Owners, but maximum USD 500.00 per port.

### Clause 48: Delivery/ Redelivery Time.
Actual time on hire to be calculated basis Greenwich Mean Time.

### Clause 49: BIMCO Double Banking Clause.
a) The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel or vessels of any size or description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.

(b) The Charterers shall pay for and provide such assistance and equipment to Masters satisfaction, including the supplying of Yokohama fenders, as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give to Owners such advance notice as they reasonably can of the details of any such operations.

(c) Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do, or stop the operations at any time he judges as necessary.

-4-

ORIGINAL

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED 20th JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW

(d) The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e) The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation.

### Clause 50: Hold Condition on First Voyage.
Upon arrival at first and subsequent load port(s) Vessel's holds are to be clean swept, washed and free of loose rust, smell or cargo residues in order satisfy the port loading requirements. Should the vessel holds and or hatches be rejected by shippers licensed surveyors, vessel to be off-hire from time of rejection until she is in all respects ready to load and all cleaning expenses shall be for Owners account, in case of dispute an independent surveyor to be appointed whose time and cost to be paid in equal parts by Owners and Charterers.

### Clause 51: ITF/Boycott.
Owners warrant that the vessel's crew is and will be during the period of this Charter Party employed under a Bona Fide Union Agreement, the standard of which is fully acceptable to the I.T.F. and Unions in all countries not excluded in this Charter Party.

In the event of the vessel being denied or restricted in the use of port and/or loading and/or discharging facilities or shore labour and/or tug or pilotage assistance or of any other restriction, detention or any loss of time whatsoever due to boycott or arrest of the vessel or due to Government restrictions, all caused by the vessel and/or by reason of the terms and conditions on which members of the crew are employed or by reason of any trading of this or any other vessel under same Ownership or operation or control, the payment of hire shall cease for the time thereby lost and all extra directly related expenses incurred due to above are to be for Owners' account and may be deducted from hire. Owners are also responsible for any valid claim that may be presented by third Party.

### Clause 52: Inspection.
The Charterers and/or their Supercargo(es) shall have free access to the vessel including but not limited to bridge, holds, engine room. Whenever required, the Master must bring the vessel to an even trim to ensure correct bunker soundings. The Charterers and/or their Supercargo(es) and/or Surveyor(s) to have free access to the vessel's deck and engine log books, radio logs, tank plans, calibration scales and/or other plans as requested and are allowed to make copies of same.

### Clause 53: Insurance.
Premium for basic war risks insurance on Hull and Machinery and Officers/crew always to be for Owners' account. An additional premium net of all rebates in respect of these risks solely arising from the vessel proceeding at the Charterers' request to areas designated as excluded areas by vessel's war risk Underwriters to be for Charterers' account, however, same not to exceed what would have been quoted or charged if the vessel was covered on the London Market. If Owners have not covered basic war risks insurance, Charterers only to pay the differential as if Owners were covered and only against presentation of Underwriters' original invoice. Blocking and trapping insurance always to be for Owners" account.

### Clause 54: Laying Up/Return Insurance - Deleted.

### Clause 55: Loading of Steel.
If the vessel is nominated to load a full or part cargo of steel products (not pig iron and slabs), the Owners to appoint a P&I club surveyor to perform a "pre-loading cargo condition survey" cost of steel preloading survey to be shared equally. Copy of such survey to be given to Charterers without delay.
In addition to Clause 8, it is understood that Owners and master are familiar with and accepts the "California block stowage" method for loading of steel slabs.

### Clause 56: Notices.
Owners are to give Charterers 10/7/5 days initial notice and 3/2/1 days definite notice of vessel's delivery to Glingrow Holding Ltd., email: chartering@glingrow.com and are to let Charterers know immediately of any change in vessel's position.

ORIGINAL

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED 20th JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW

### Clause 57: Off-Hire.
Should the vessel put back whilst on voyage by reason of any accident or breakdown, or in the event of loss of time either in port or at sea or deviation upon the course of the voyage caused by sickness of or accident to the crew or any person onboard the vessel (other than Supercargo traveling by request of the Charterers) or by reason of the refusal of the Master or crew to perform their duties, or by reason of salvage, or oil pollution even if alleged, or capture/seizure, or detention or threatened detention by any authority including arrest, the hire shall be suspended from the time of the inefficiency until the vessel is again efficient in the same or equidistant position in Charterers' option, and voyage resumed therefrom. All extra directly related expenses incurred including bunkers consumed during period of suspended hire shall be for Owners' account.

The Charterers may in their option, partly or wholly, add any off-hire period(s) to the Time Charter period.

During any off-hire period estimated to exceed 8 days, the Owners to give the Charterers not less than 5 days approximate notice of resumption of the service.

If the vessel has been off-hire for a period of more than 30 days, the Charterers are at liberty to cancel the balance of this Charter Party, in which case redelivery shall take place upon vessel being free from cargo, irrespective of redelivery ranges.

### Clause 58: Oil Pollution.
Owners guarantee to have secured current certificates for countries/federal states or municipal or other division or authority thereof, where guarantees are required. All such certificates to be valid throughout the entire Time Charter period.

The Charterers shall in no case be liable for any damages as a result of the Owners' failure to obtain the aforementioned certificates. Time lost by non-compliance to be considered as off-hire and may be deducted from hire and Owners hold Charterers harmless against any consequential losses, damages and expenses.

### Clause 59: On/Off-Hire Survey.
The parties shall appoint a joint independent surveyors for shared accounts who shall not later than at first loading port/last discharging port respectively conduct joint on-hire/off-hire surveys for the purpose of ascertaining quantity of bunkers on board and the condition of the Vessel and expenses to be shared equally (50/50). On-hire survey shall be on Charterers' time and off-hire survey on Owners' time. No time to be deducted for on/off hire surveys unless actually lost. Such survey to take place at such time so that loading/discharging operations not interrupted therefore normally there will be no off-hire in this respect unless vessel is off-hire due to other reasons or fault of ship's crew.

### Clause 60: Panama/Suez Canal.
Owners warrant that the vessel is fitted for the transit of the Suez and Panama Canal in loaded and/or ballast condition and complies with all and any regulations of the relevant canal authority and shall not be subject to any conditions of transit not customarily required by the relevant canal authority whether pursuant to their regulations or otherwise. Should the vessel not comply with the warranties contained in this Clause and/or any regulations or conditions of transit laid down by the relevant canal authority, Charterers may suspend hire for all time lost and Owners to pay all expenses resulting as a consequence of Owners' failure to comply with this warranty.

### Clause 61: Deleted.

### Clause 62: Power Clause.
The vessel is to supply free of expense to Charterers electric power from the power supply panel in each cranehouse. Charterers have the right to fit/connect magnets, grabs or other loading/discharging equipment customary to the trade onto vessel's cranes and/or power supply. It is possible to do 30 kvs.

### Clause 63: Protective Clauses.
The General Clause Paramount, the Both-to-Blame Collision Clause, the New Jason Clause, Baltic Conference War Risks Clause for Time Charters 1993 (Code name: Conwartime 1993), as applicable and attached, are all to be considered as incorporated into this Charter party and all Bills of Lading issued under this Charter shall be subject to all said Clauses except Conwartime 1993, but shall also be subject to Voywar 1993.

Should Charterers employ vessel in carrying grain on voyage basis, Bimco Conwartime 2004 to apply instead of Conwartime 1993, but for sake of good order Charterers always to tender prior notice to Owners, providing the intended routing and ports of call.

Should a particular trade on which the vessel is employed apply the U.S.A. or the Canadian Clause Paramount compulsorily then such Clauses to be considered incorporated into this Charter and shall be incorporated into Bills of Lading on that trade.

ORIGINAL

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED 20th JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW

### Clause 64: Punctual Payment.

With reference to Clause 5, the Owners to give Charterers two (2) New York banking days' written notice excluding Sundays and Holidays to rectify a failure to make punctual and regular payment before exercising their right of withdrawal.

When the Vessel has been redelivered, any difference is to be refunded by the Owners or paid by the Charterers, as the case may be within 5 banking days basis mutually agreed final hire statement. In case of discrepancy between owners and Charterers statement the undisputed balance to remitted within 5 banking days after vessels redelivery.

### Clause 65: Deleted.

### Clause 66: Stevedore Damage.

Any damage caused by stevedores during the currency of this Charter Party shall be reported by the captain to the Charterers or their agents in writing within 24 hours of the occurrence or as soon as possible thereafter, the captain shall immediately arrange in conjunction with Charterers' agents for the damage to be surveyed and an estimate of the repair cost given, if possible, in case of hidden damage same to be notified as soon as discovered but not later than vessel's redelivery. The captain shall use his best efforts to obtain written acknowledgement by responsible parties causing damage unless damage should have been made good in the meantime. Stevedore damages involving seaworthiness shall be repaired without delay to the vessel after each occurrence in Charterers' time and shall be paid for by the Charterers. Other minor repairs shall be done at the same time, but if this is not possible, same shall be repaired while vessel is in dry-dock in Owners' time, provided this does not interfere with Owners' repair work or by vessel's crew at Owners' convenience.

Any time spent in repairing stevedore damage shall be for Charterers' account. Charterers shall pay for stevedore damage whether or not payment has been made by stevedores to the Charterers.

### Clause 67: Taxes.

Taxes and/or dues and/or charges whatsoever imposed on cargo by any local or national authorities, arising out of trade under this Charter Party to be borne by Charterers. Taxes levied by Governments other than that of Owners' domicile or vessel's flag on earnings under this Charter Party other than the hire payable to Owners shall be for Charterers' account.

In case any taxes and/or dues and/or quotations are imposed by Russian or any national authorities for export and/or import of grain cargoes Charterers have a right to short period of this charter with tendering of not less than 25 days notice to the Owners and redelivery the ship in agreed range without any responsibility.

### Clause 68: Warranties.

To the best of Owners' knowledge, the vessel:
- Is not blacklisted by Arab countries nor anywhere else within the agreed trading limits.

### Clause 69: Watertight Hatches.

The Owners guarantee that on vessel's delivery and throughout the currency of this Charter the vessel's hatchcovers are watertight. All hatches are to be carefully attended by the crew to prevent leakage.

The Charterers have the option to perform hose/pressure/ultrasonic or similar tests on all hatches at any time during the Charter Party.

### Clause 70: Weather Routing.

The Charterers may supply an Independent Weather Bureau's advice to the Master, during voyages specified by the Charterers and the Master shall comply with the reporting procedure of the Weather Bureau, however, the Master remains responsible for the safe navigation and choice of route. Alternatively Charterers have the option to instruct the Master to report daily to a Weather Bureau during the execution of the sea voyages. The Weather Bureau will subsequently produce a performance analysis report.

Evidence of weather conditions shall be taken from the vessel's deck logs and Independent Weather Bureau's report. In the event of discrepancy between the deck logs and the Independent Weather Bureau's reports, the Independent Weather Bureau's reports shall be final and binding on both Parties.

-7-

ORIGINAL

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED 20th JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW

### Clause 71: Towage, Pilotage, etc.
The Owners authorize the Charterers, as Agents of and on behalf of the Owners and/or the vessel, to arrange and contract for any towage, pilotage or the like service on usual or customary terms, and/or those terms offered or required by towing/pilotage companies employed where such services are furnished.

### Clause 72: War Cancellation.
If major war breaks out between any two or more of the following countries: United Kingdom, USA, Russia, Peoples Republic of China, Japan directly affecting the performance of the Charter, both the Owners and the Charterers shall have the option of canceling this Charter with mutual agreement whereupon the Charterers shall redeliver the vessel to the Owners in accordance with Clause 4, if she has cargo on board, after discharging thereof at destination, or, if debarred from reaching or entering it, at a near open and safe port as directed by the Charterers, or if she has no cargo on board at a port at which she stays or if at sea at a near safe port as directed by the Owners. In all cases hire shall be paid until the vessel's redelivery.

### Clause 73: Deleted.

### Clause 74: Year 2000 Compliance - Deleted.

### Clause 75: ISM.
From the date of coming into force of the International Safety Management (ISM) Code in relation to the vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the vessel and the Company (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterer. Except as otherwise provided in this Charter Party, loss, damage, expense or delays caused by failure on the part of the Owners or the Company to comply with the ISM Code shall be for the Owners' account.

### Clause 76: Lien.
In the event that Charterers have a contractual or statutory right of lien over cargo carried on board for hire, freight, deadfreight or demurrage Owners shall co-operate with Charterers in exercising a lien over the cargo and shall retain possession of the cargo on their behalf and deal with the cargo on Charterers' instructions. Owners have lien on the sub-hire/freight.

### Clause 77: Description Clause.
MV STRANGE ATTRACTOR 1
-SID/BC/LAKER/BUILT 1979-HAKODATE JAPAN/CYPRUS FLAG/B.V.
-28.872 MT DWAT ON 10.687 MTRS SUMMER SALT DRAFT TPC: 36,400
-GRT/NRT 17159/10978
-SUEZ NRT 14544,24
-PANAMA NRT 14638,22
-LOA/BM 180.81/23.14
-6/6 HH MCGREGOR SINGLE PULL H/COVERS
-GR/BL 1232006/1192598 CBFT
-HA SIZES 1=8.22 2=13.02 3-5=15.20 6=12.8 ALL BY 11.2 MTRS
-5 CRANES X 15-20 MTS
BSS 15TS LIFTING CAPACITY : OUTREACH 8,45 MTRS / RADIUS 20 MTRS
BSS 20TS LIFTING CAPACITY : OUTREACH 2,95 MTRS / RADIUS 14,5 MTRS

-CLASS: BV
-P&I: AMERICAN CLUB

-LAKES-CO2 FITTED-NATURAL VENTILATION-GRAIN FITTED
-STRENGHENED FOR CARRIAGE OF HEAVY CARGOES- HOLDS NO. 1 & NO. 4 MAY BE EMPTY
-BREAKDOWN OF HOLDS / CORRUGATION VERTICAL
GRAIN BALE
131.777 126.529
190.646 184.978
232.551 225.555
234.768 226.653
236.232 229.224

-8-

ORIGINAL

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED 20ᵗʰ JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW

206.022 199.659
-------------------
1.232.006 1.192.598

HOLD DIMENSIONS HATCH DETAILS
------------------------------------------------------

TANKTOP TANKTOP WIDTH HATCH HATCH WLINE
LENGTH FDW/AFT LENGTH WIDTH H TOP
1. 8.22 11.20 10.60 1. 15.45 6.20/15.40
2. 13.02 11.20 10.00 2. 18.75 15.40/16.05
3. 15.20 11.20 9.80 3. 22.80 16.50
4. 15.20 11.20 9.20 4. 22.80 16.50
5. 15.20 11.20 8.80 5. 22.60 16.50
6. 12.80 11.20 8.40 6. 17.75 16.05/12.00

STRENGTHS
------------------

T/TOP H/COVER DECK
1. 16.60 0.88 2.12
2. 21.00 0.88 2.12
3. 18.90 1.30 2.53
4. 15.70 1.30 2.53
5. 17.20 1.71 2.94
6. 17.20 1.71 2.94

SPEED/CONSUMPTION UNDER GOOD WEATHER CONDITION AND FAIR SEAS

ABT 13K ON ABT 25.5 MT(B)/ABT 12.5K ON 26.7 MT(L) IFO + ABT 2.7MT MGO AT SEA

PORT CONS:
IDLE : ABT 2,2 MT MGO + BOILER ABT 0,7 MT MGO
GEAR WORKING ABT 2,7 MT MGO + BOILER ABT 0,7 MT MGO
VSL CONSUMES MGO IN MAIN ENGINE WHEN MANOEVERING, SAILING
RESTRICTED WATERS/CANALS/FOG ETC

FUEL SPECS:
INTERMEDIATE FUEL OIL 180 CST GRADE ISO 8217:2005, FUEL STANDARD: RME 25
MARINE GAS OIL: ISO 8217:2005, FUEL STANDARD: DMA DISTILLATE
MARINE FUEL, FUEL MUST NOT CONTAIN ANY AUTOMOTIVE LUBRICATING OIL OR
OTHER WASTE CHEMICALS NOR ANY ALUMINIUM AND/OR SILICON

TANK CAPACITIES:
wing tank 130000 cft
A. BALLAST TANKS 8332 cub.m
B. BALLAST HOLDS CAPACITY 6649.5 cub.m
CONSTANTS EXCLUDING FRESHWATER 300 mt
DAILY FRESHWATER CONSUMPTION 8 mt
FRESH WATER CAPACITY 221 cub.m
STATE CAPACITY AND DAILY PRODUCTION OF EVAPORATOR 12-14 mt
NORMAL FRESH WATER RESERVE 150 mt
PERMANENT BUNKER CAPACITIES (EXCLUDING UNPUMPABLES) BASIS 96PCT CAPACITY:
FO- 1664.8 mt
DO- 322.8 mt
ALL CAPACITIES ARE GIVEN BSS EVEN KEEL CONDITION ALL DETAILS ABOUT GIVEN IN GOOD FAITH
BUT WOG.

OWNERS: JAPONICA ENTERPRISES CO., MARSHAL ISLANDS
DISPONENT OWNERS: CAPITAMALL LLC, ALBANY, USA

- Owners confirm vessel is grain clean and has on board valid documents of Authorization for carriage of grains in bulk
- Owners confirm that vessel is suitable for grab discharge

-9-

ORIGINAL

## ADDITIONAL CLAUSES TO CHARTER PARTY
## DATED 20th JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW

- Owners confirm vessel is classed by bureau veritas and ISM / ISPS code fitted for the whole duration of voyage
- Owners confirm vessel has all valid documents/certificates available on board for draft survey
- Owners confirm that vessel is not blacklisted for load and/or discharge countries / ports and suitable for this trade
- Ownership/Class/Pandf club/H+M insurance not to be changed throughout whole trip duration
- In case of discharging at Aqaba Owners to provide to Charterers usual Jordan certificates as per L/C requirements

- Last cargo - steels, steel pipes, general cargoes


### Clause 78: BIMCO ISPS Clause for Time Charter Parties.
(a)(i)  From the date of coming into force of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) in relation to the Vessel and thereafter during the currency of this Charter Party, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISPS Code) shall comply will the requirements of the ISPS Code relating to the Vessel and "the Company". Upon request the Owners shall provide a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) to the Charterers. The Owners shall provide the Charterers with the full style contact details of the Company Security Officer (CSO).

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Owners or "the Company" to comply with the requirements of the ISPS Code or this Clause shall be for the Owners account.

(b)(i)  The Charterers shall provide the CSO and the Ship Security Officer (SSO)/Master with their full style contact details and, where sub-letting is permitted under the terms of this Charter Party, shall ensure that the contact details of all sub-charterers are likewise provided to the CSO and the SSO/Master. Furthermore, the Charterers shall ensure that all all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

> "The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii)  Except as otherwise provided in this Charter Party, loss, damage, expense or delay, excluding consequential loss, caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account.

(c)  Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code including, but not limited to, security guards, launch services, tug escorts, port security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the Owners' negligence. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

(d)  If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

### Clause 79: - Deleted.

### Clause 80:
It is herewith understood that, Charterers undertake to instruct their Agents / Bunker's suppliers and in general all parties involved with services rendered to the vessel, on Time - Charterers behalf, to countersign Master's letter that they are accepting these services as Agent, on behalf of the Charterers only. Vessel and / or Owners are not and will never be responsible for unpaid bills. In case Master is unable to obtain such a letter, Owners have the right to put, all above parties on notice that they will not accept any responsibility or claim owing to delay of payment by Charterers.



--oOo--

ORIGINAL

ADDITIONAL CLAUSES TO CHARTER PARTY
DATED 20th JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW

## GENERAL AVERAGE AND THE NEW JASON CLAUSE

General Average shall be payable according to the York/Antwerp Rules 1974 as amended 1990, but where the adjustment is made in accordance with the law and practice of the United States of America, the following clause shall apply:

## NEW JASON CLAUSE:

In the event of accident, danger, damage or disaster before or after the commencement of the voyage resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence for which, the carrier is not responsible, by statute, contract or otherwise, the goods, shippers, consignees or owners of the goods shall contribute with the carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required be made by the goods, shippers, consignees or owners of the goods to the carrier before delivery.

## BOTH-TO-BLAME COLLISION CLAUSE:

If the liability for any collision in which the vessel is involved while performing this charter party fails to be determined in accordance with the laws of The United States of America, the following clause shall apply:

## NEW BOTH-TO-BLAME COLLISION CLAUSE:

"If the ship comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship, the owners of the goods carried hereunder will indemnify the carrier against all loss or liability to the other or noncarrying ship or her owners in so far as such loss or liability represents loss of or damage to or any claim whatsoever of the owners of the said goods, paid or payable by the other or non carrying ship or her owners to the owners of the said goods and set off, recouped or recovered by the other or non carrying ship or her owners as part of their claim against the carrying ship or carrier.

The foregoing provisions shall also apply where the owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect to a collision or contract".

And the charterers shall procure that all Bills of Lading issued under this charter party shall contain the same clause.

## GENERAL PARAMOUNT CLAUSE:

This Bill of Lading shall have effect subject to the provisions of any legislation relating to the carriage of goods by sea which incorporates the rules relating to Bills of Lading contained in the International Convention, dated Brussel 25th August, 1924 and which is compulsory applicable to the contract of carriage herein contained. Such legislation shall be deemed to be incorporated herein, but nothing herein contained shall be deemed a surrender by the Carrier of any of its rights or immunities or an increase of any of its responsibilities or liabilities thereunder. If any term of this Bill of Lading be repugnant to any extent to any legislation by this clause incorporated, such term shall be void to that extent but no further. Nothing in this Bill of Lading shall operate to limit or deprive the Carrier of any statutory protection or exemption from or limitation of liability.

## BIMCO STANDARD WAR RISKS CLAUSE FOR TIME CHARTERS, 1993
### Code Name: "CONWARTIME 1993"

(1) For the purpose of this Clause, the words:

(a) "Owners" shall include the shipowners, bareboat Charterers, disponent Owners, managers or other operators who are charged with the management of the Vessel, and the Master, and

(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all

vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

-11-

ORIGINAL

**ADDITIONAL CLAUSES TO CHARTER PARTY**
**DATED 20th JULY 2007 MV "STRANGE ATTRACTOR 1" / GLINGROW**

(2) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely lo be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(3) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents right of search and/or confiscation.

(4) (a) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their Protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account;

(b) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then such premiums and/or calls shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due.

(5) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then such bonus or additional wages shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due.

(6) The Vessel shall have liberty:-

(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(b) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(d) to divert and discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(e) to divert and call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject lo internment, imprisonment or other sanctions.

(7) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(8) If in compliance with any of the provisions of sub-clauses (2) lo (7) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfillment of this Charter Party.

-12-

## VERIFICATION

STATE OF NEW YORK     )
                               ) ss:
COUNTY OF NEW YORK  )

        Oliver Beiersdorf verifies the following:

        I am an associate of the firm of Reed Smith LLP, counsel for plaintiff herein, and make the following Verification pursuant to the Federal Rules of Civil Procedure, Supplemental Rule B, 28 U.S.C.§ 1746 and the Local Rules for the United States District Courts for the Southern District of New York.  I have read the foregoing Verified Complaint, know the contents thereof and believe the same are true to the best of my knowledge, information and belief.

        The sources of my information and the grounds of my belief are documents in possession of my firm and communications I have had with plaintiff's representatives.

        The reason this Verified Complaint is made by the undersigned rather than by plaintiff is that plaintiff is a foreign corporation none of whose officers or directors are within the District.  I am authorized to make this Verification on behalf of plaintiff.

        I declare under the penalty of perjury that the foregoing is true and correct.  Executed on May 2, 2008 in New York, New York.

Oliver Beiersdorf (OB-1421)
599 Lexington Avenue
New York, NY  10022-7650
Telephone:  212.521.5400
Facsimile:  212.521.5450